IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

JACKIE E. GRAY,                                                    CV. 06-222-AS

                 Plaintiff,                          FINDINGS AND
                                                                    RECOMMENDATION

    v.

JO ANNE B. BARNHART,
Commissioner, Social Security
Administration,

                 Defendant.

_____

ASHMANSKAS, Magistrate Judge:

      Plaintiff Jackie Gray ("Gray") filed this action under section 205(g) of the Social Security

Act (the "Act") as amended, 42 U.S.C. §405(g), to review the final decision of the Commissioner

of Social Security (the "Commissioner"), who denied him social security disability insurance

benefits ("Benefits").

<u>PROCEDURE</u>

      On or about August 17, 2001, Gray filed an application for Benefits alleging an onset date

of December 1, 1989.  The application was denied initially, on reconsideration, and by the

Administrative Law Judge (the "ALJ") after a hearing.[1]  The Appeals Council denied review and the ALJ's decision became the final decision of the Commissioner.

## FACTS

Gray is fifty-years old.  He completed the eighth grade and obtained a GED in 1991.  His past relevant work experience includes employment as a millworker.  Gray has not been involved in a successful work attempt since December 1, 1989.  Gray alleges disability because of severe fatigue caused by chronic aortic insufficiency with aortic root dilation as well as chronic back and leg pain.  Gray last met the insured status requirements entitling him to Benefits on December 31, 1994.

### Testimony

Gray indicated that he has always had problems with his lower back which were exacerbated in late 1998, when he pulled a muscle which wouldn't heal.  As a result, he went to work at a propane distributing company which did not have the same physical requirements as his previous job of millworker. Within a week, his back went out completely and he was terminated.

Thereafter, Gray's right leg was weak and would give out on occasion.  Before his back surgery in 1990, he was unable to walk without assistance.  After the surgery, he continued to have difficulties with numbness and pain in his right side.  He is able to stand for 15 minutes and sit for an hour before needing to rest or change positions.  He needs to lay down twice during the day for half an hour to relieve the pain.

---

[1]The ALJ initially denied the request for hearing finding that the denial of a prior application, filed on June 16, 1998, barred consideration of the current application.  The Appeals Council overruled the ALJ and directed him to hold a hearing and address the current application.

Gray testified that he started having problems with his heart shortly after his back surgery in 1990. He was having trouble recovering from the surgery and discovered the next year that he had elevated blood pressure and a heart murmur. The condition was treated with medication and a yearly echocardiogram. However, Gray continued to suffer from fatigue and, occasionally, an irregular heartbeat. Gray had his aortic valve replaced in 1999. He felt a little more alert after the replacement but continued to suffer from fatigue.

Gray mentioned a hearing loss and the inability to deal with emotional things. He becomes ill after being in a stressful situation and has trouble dealing with other people. He has had this problem his whole life but it got worse after the birth of his son in 1977. Gray testified that he does not have contact with anyone other than his family. He also developed problems with his memory after the heart surgery. His wife and son help him to remember to take his medications.

Beginning in 1999, Gray helped coached his son's softball team. He prepared the game lineups and served as a base coach. He would also assist in warming up the players before the game by shagging and fielding during batting practice. He also shot baskets with his sons once or twice a week for about an hour on the basketball hoop he installed on his patio.

Gray explained that he seldom went to the doctor between his back surgery in 1990 and his treatment with Dr. Smith in 1994 because he didn't have the money to pay the medical bill. Eventually, Gray filed bankruptcy and he was able to benefit from regular medical treatment thereafter.

Gray's spouse, Wendy, testified that Gray was fatigued before his back surgery and would sleep the majority of the time he was off work. After his back surgery, he seemed depressed, angry and really tired. He had difficulty sleeping and would sometimes sleep on the floor in the living

room with his legs on the couch.  He has to constantly change his position and has trouble pressing the gas when he is driving.

**Medical Evidence**

The first evidence of Gray's back problem is found in x-ray's taken in December 1989.  On January 12, 1990, Norwyn R. Newby, M.D.,  performed a microdiskectomy at L5-S1 and noted that "the patient had a calcified disc herniation at L5-S1 on the right side with calcification of ligamentum flavum.  He also had a frank herniation at the same level, just medial to the L5 nerve root." A.R. at 162.  Dr. Newby reported that Gray did well and ambulated the day after surgery, denying any sciatica.  A chest x-ray taken shortly after the surgery revealed "no definite evidence for acute cardiopulmonary disease." A.R. at 153.

The next medical records are dated November 1994, when Gray sought to refill  medications for his long-standing hypertension and aortic insufficiency from Dean L. Smith, M.D.  At this time, Gray reported to Dr. Smith that he had "previously attended computer trade school, although he [was] presently working various odd jobs."   For the next five years, Dr. Smith served as Gray's primary physician.   During this period, Dr. Smith referred regularly to Gray's history of obesity/deconditioning and occasionally mentioned complaints from Gray of recurring low-back pain.

In May 1995, Dr. Smith reported that Gray's essential hypertension was under "excellent control" and that his aortic insufficiency, which was stable at the time, had "actually decreased in left ventricular volume as compared to an echocardiogram from four years ago." A.R. at 182.

On July 20, 1998, Dr. Smith wrote that the claimant's "two major health problems, hypertension and aortic valvular regurgitation, * * *  have either been well controlled with

medication or not significantly troublesome to him.  He, as such, should not have significant disability engaging in regular work related activities."[2] A.R. at 167.

In mid-1999,  Dr. Smith reported that Gray recovered from his heart surgery sooner than expected and released Gray to his prior activities, such as softball, with the understanding that he refrain from heavy lifting and other forms of extreme exertion.  In July 1999, Gray told Dr. Smith that he had regained his strength and vigor following the surgery and "has been playing softball and other relatively vigorous activities." A.R. at 232.

Randy Visser, D.O. assumed the responsibility as Gray's treating physician in January 2000 and assisted Gray by adjusting some of his medications to alleviate an increase in his  diastolic rate and intermittent swelling and flushing of his face.  In May 2000, Gray sought assistance for  low-back pain.  Gray did not know what caused the pain but reported that "he has been playing basketball and had been feeling terrific without any particular complaints." A.R. at 236.  Dr. Visser prescribed a medication for what he believed was a low-back strain and reported that Gray was stable from a cardiac standpoint.  By August 2000, the low-back pain had resolved and Gray was again playing basketball routinely.  Thereafter, Gray was treated by Dr. Visser, H. Derek Palmer, M.D., and Charles E. Hofmann, M.D. for his cardiac-related complaints.

On October 14, 2004, Dr. Hofmann wrote that:

Mr. Gray suffers from heart disease, degenerative arthritis of the back and depression.  He is status post replacement of an aortic valve in 1999 and suffers from residual fatigue.  He has chronic low back pain currently controlled with Tylenol and prn Tramadol and takes Prozac for his depression.

---

[2]Dr Smith also noted that Gray had complained of low back pain but that he did not seek evaluation for this from Dr. Smith so Dr. Smith was not prepared to comment on Gray's disability status based on his back.  He did recommend an independent medical evaluation.

His current level of activity prevents him from being employable at this time.

A.R. at 281.   Two months later, Dr. Hofmann considered Gray to be:  1) moderately limited in his ability to remember locations and work-like procedures; understand and remember detailed instructions; sustain an ordinary routine without special supervision; make simple work- related decisions; interact appropriately with the general public, ask simple questions or request assistance; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; and be aware of normal hazards and take appropriate precautions; 2) markedly limited in his ability to carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; work in coordination with or proximity to others without being distracted; accept instructions and respond appropriately to criticism from supervisors; respond appropriately to changes in the work setting; travel in unfamiliar places or use public transportation; and set realistic goals or make plans independently of others; and 3) extremely limited in his ability to complete a normal workday and workweek without interruptions from psychologically-based symptoms, and to perform at a consistent pace without an unreasonable number and length of rest periods.  Dr. Hofmann indicated that Gray could lift and/or carry 15 pounds occasionally and 50 pounds frequently; sit continuously for one hour and stand or walk continuously for 15 minutes during an eight-hour work day; sit for four hours and stand or walk for one hour with breaks during an eight-hour work day.  Gray needs to lie down or rest for half an hour twice a day during an eight-hour work day.  Gray was limited to only occasional climbing, balancing, stooping, kneeling, crouching and crawling and should avoid moderate exposure to extreme heat and heights.

## Vocational Evidence

Gail Young, M.S., C.R.C., appeared as a vocational expert at the hearing.  Based on the hypothetical posed by the ALJ,[3] Young opined that Gray could not do his past work but could work as a gate guard or a surveillance system monitor.  Young felt that, even if Gray was limited to lifting 10 pounds and needed to recline every two hours for 15 minutes, he could still perform these jobs.  However, if Gray needed to recline for half an hour at a time, he would be disqualified from both jobs.

## ALJ Decision

The ALJ determined that Gray's impairments, which he identified as essential hypertension, moderate valvular regurgitation and chronic low back pain, did not significantly limit his ability to perform basic work-related activities before December 31, 1994.  Accordingly, the ALJ found that Gray was not disabled under the Act.  The ALJ noted that Gray had the burden to "show a medically determinable impairment and to submit medical and other evidence from acceptable sources demonstrating medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques, which show the existence of the impairment." A.R. at 15.   The ALJ

---

[3]"Assume a worker 33 years of age.  Please – or let's make that 38.  It probably doesn't make any difference.  Please assume that this worker has the same educational and vocational background as Mr. Gray.  Please assume that this worker can stand or walk for no more than 15 minutes at any one time, two hours maximum in a workday.  Worker can sit for no more than one hour at a time, no overall limit.  This worker should not be exposed to any hazardous environments including moving equipment, machinery, or unprotected heights.  This worker is limited to simple, routine, repetitive work.  This worker can lift 20 pounds occasionally, 10 pounds frequently. Given that hypothetical, would that hypothetical worker be able to perform any of the jobs you identified for Mr. Gray." A.R at 332.  The ALJ later clarified the hypothetical stating "A person could stand or walk for 15 minutes at a time but not to exceed two hours total in a day.  They can sit for up to an hour at a time but then after that hour need to stand or walk for just a couple of minutes and then can resume sitting again.

considered all of the evidence presented, including the testimony offered at the hearing, and found

that there was no "indication that claimant ever experienced significant functional limitations for a

continuous period of not less than 12 months. A.R. at 15.

> The ALJ specifically addressed the available medical evidence and explained that:

> Dean Smith, M.D., noted in May 1995 – after his date last insured – that the claimant's impairments were stable, but that he remained obese and unconditioned. Dr. Smith recommended that he continue his treatment regimen and begin exercising. Again in February 1996, the claimant complained of radicular symptoms, and Dr. Smith prescribed conservative treatment. By January 1999 the claimant's left ventricular ejection fraction (LVEF) was reduced to 40 percent. In April 1999, he obtained a mechanical aortic valve replacement, and began lifelong anticoagulant therapy. The record shows that after that the claimant remained very active, and by July 2002, his LVEF has increased to 53 percent. Nonetheless, the claimant continued to complaint of fatigue and depression, but his treating medical sources opined that he was doing well. In addition, the clinical notes recorded after his date last insured occasionally mention depression, but apart from a prescription for Prozac, there is no evidence that the claimant has ever sought treatment for this condition. Likewise, the claimant's complaints of memory problems and fatigue are most probably symptoms of mild depression and significant deconditioning. With nothing more to corroborate the frequency and intensity of the claimant's alleged symptoms, the undersigned must conclude that on or before December 31, 1994, the claimant's impairments did not significantly limit his physical or mental ability to do basic work activities and were not severe.

A.R. at 15.

## STANDARD OF REVIEW

The Act provides for payment of Benefits to people who have contributed to the Social

Security program and who suffer from a physical or mental disability. 42 U.S.C. § 423(a)(1). The

burden of proof to establish a disability rests upon the claimant. Gomez v. Chater, 74 F.3d 967, 970

(9th Cir.), cert. denied, 519 U.S. 881 (1996). To meet this burden, the claimant must demonstrate

an inability to engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to cause death or to last for a continuous

period of at least twelve months.  42 U.S.C. § 423(d)(1)(A).  An individual will be determined to be disabled only if there are physical or mental impairments of such severity that the individual is not only unable to do previous work but cannot, considering his or her age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.  42 U.S.C. §  423(d)(2) (A).

The Commissioner has established a five-step sequential evaluation process for determining if a person is eligible for Benefits he or she is disabled.  20 C.F.R. § 404.1520; Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995).  First, the Commissioner determines whether the claimant is engaged in "substantial gainful activity."  If the claimant is engaged in such activity, disability benefits are denied.  Otherwise, the Commissioner proceeds to step two and determines whether the claimant has a medically severe impairment or combination of impairments.  A severe impairment is one "which significantly limits [the claimant's] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1520(c).  If the claimant does not have a severe impairment or combination of impairments, Benefits are denied.

If the impairment is severe, the Commissioner proceeds to the third step to determine whether the impairment is equivalent to one of a number of listed impairments that the Commissioner acknowledges are so severe as to preclude substantial gainful activity.  20 C.F.R. § 404.1520(d).  If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled.  If the impairment is not one that is presumed to be disabling, the Commissioner proceeds to the fourth step to determine whether the impairment prevents the claimant from performing work which the claimant has performed in the past.  If the claimant is able to perform work which he or she has performed in the past, a finding of "not disabled" is made and

disability benefits are denied.  20 C.F.R. § 404.1520(e).

If the claimant is unable to do work performed in the past, the Commissioner proceeds to the fifth and final step to determine if the claimant can perform other work in the national economy in light of his or her age, education, and work experience.  The burden shifts to the Commissioner to show what gainful work activities are within the claimant's capabilities.  Distasio v. Shalala, 47 F.3d 348, 349 (9th Cir. 1995).  The claimant is entitled to disability benefits only if he or she is not able to perform other work.  20 C.F.R. § 404.1520(f).

When an individual seeks Benefits, judicial review of the Commissioner's decision is guided by 42 U.S.C. § 405(g).  This court must review the case to see if the decision of the Commissioner is supported by substantial evidence.  Substantial evidence is such relevant evidence as a reasonable person might accept as adequate to support a conclusion.  Drouin v. Sullivan, 966 F.2d 1255, 1257.  It is more than a scintilla, but less than a preponderance, of the evidence.  Id.; Gonzalez v. Sullivan, 914 F.2d 1197, 1200 (9th Cir. 1990).  Even if the Commissioner's decision is supported by substantial evidence, it must be set aside if the proper legal standards were not applied in weighing the evidence and in making the decision.  Gonzalez, 914 F.2d at 1200.  The court must weigh both the evidence that supports and detracts from the Commissioner's decision.  Id.  The trier of fact, and not the reviewing court, must resolve conflicts in the evidence, and if the evidence can support either outcome, the court may not substitute its judgment for that of the Commissioner.  Gomez, 74 F.3d at 970.

## DISCUSSION

In this case, the ALJ determined that Gray had failed to establish that his impairments were severe and significantly limited his physical or mental ability to perform basic work activities.

Accordingly, the ALJ found Gray not disabled at step two and did not proceed to the following steps.

At step two, an ALJ may find a claimant's impairment "not severe" and determine that the claimant is not disabled

> when medical evidence establishes only a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work * * * i.e. the person's impairment(s) has no more than a minimal effect on his * * * ability(ies) to perform basic work activities * * * . The severity requirement cannot be satisfied when medical evidence shows that the person has the ability to perform basic work activities, as required in most jobs.

SSR 85-28. At the second step of sequential evaluation, medical evidence alone is evaluated in order to assess the effects of the impairment on ability to do basic work activities and the burden is on the claimant to provide such evidence. Id.; see also Bowen v. Yuckert, 482 U.S. 137, 146.

There is little medical evidence in the record for the relevant period. Gray alleges that he became disabled on December 1, 1989, as a result of back pain. Dr. Newby performed back surgery on January 12, 1990. Gray was able to walk the next day and denied experiencing any sciatica at that time. Later that month, Gray complained of a "fluttering heart" with no chest pain. X-rays revealed no acute pulmonary disease. It appears that Gray did not seek medical assistance for either his back or his heart again until November 1994, when he began treating with Dr. Smith for his hypertension and aortic sufficiency. Gray's right to disability benefits ended December 31, 1994. The following year, Dr. Smith reported that Gray's hypertension was under "excellent control" and that his aortic insufficiency had improved. Based on this medical evidence, the ALJ did not err in finding that Gray's impairments were not severe.

Even considering lay testimony and Gray's comments to his physicians during the relevant

period, the ALJ's determination is supported by the record. Gray testified that he suffered from back and leg pains for years and that he eventually had to change jobs because of the back pain. It wasn't until he suffered an acute injury that he was prevented from working at the new job. The back surgery in 1990 appeared to resolve the majority of the pain, as Gray reported no feelings of sciatica after the surgery and did not seek any pain medications for the back thereafter. Similarly, Gray successfully dealt with his hypertension and aortic insufficiency during the relevant time period. Wendy Gray testified that Gray was tired a lot and slept most of the time he was off work, but the heart problems did not prevent Gray from working. Additionally, it appears that the problems were treated successfully with medications. Gray was able to obtain his GED in 1991, during the period he was allegedly disabled and in November 1994, Gray reported to Dr. Smith that he had attended computer trade school and was presently working odd jobs. All of this evidence would tend to support the determination that Gray was not disabled during the relevant period.

Gray contends that the ALJ erred in not fully developing the record. Specifically, Gray asserts that, in the absence of medical records from the date of his disability to the date he was last insured, the ALJ had an obligation to question a medical expert with regard to Gray's disability during this period.

In social security cases, the ALJ has a special duty to develop the record fully and fairly and to ensure that claimant's interests are considered, even when claimant is represented by counsel. See 42 U.S.C. § 301 *et seq*. The ALJ's duty to develop the record further is triggered when there is ambiguous evidence, or when the record is inadequate to allow for proper evaluation of evidence. Id. This duty derives in part from the basic premise that disability hearings are not adversarial in nature. Sims v. Apfel, 530 U.S. 103, 110-111 (2000). It is also based on the regulatory directive

that, in an administrative hearing, the ALJ "looks fully into the issues." 20 C.F.R. § 404.944.

As part of this duty, the ALJ has an obligation to take reasonable steps to ensure that issues and questions raised by medical evidence, particularly evidence from treating physicians, are addressed so that the disability determination is fairly made on a sufficient record of information, both favorable and unfavorable to the claimant. See generally Tidwell v. Apfel, 161 F.3d 599, 602 (9th Cir. 1999); see also 20 C.F.R. § 404.1527(c)(3)(providing steps to obtain additional evidence where medical evidence is insufficient to determine whether claimant is disabled); 20 C.F.R. § 404.1512(e)(providing measures for obtaining additional information from treating doctors). Finally, where it is necessary to enable the ALJ to resolve an issue of disability, the duty to develop the record may require consulting a medical expert or ordering a consultative examination. 20 C.F.R. § 404.1519a; see also Armstrong, 160 F.3d at 587, 590 (9th Cir. 1998)(where there were diagnoses of mental disorders prior to the date of disability found by the ALJ, and evidence of those disorders even prior to the diagnoses, the ALJ was required to call a medical expert to assist in determining when the plaintiff's impairments became disabling).

Here, it is clear that Gray did not seek medical assistance for his impairments during the period in question. The closest thing to a treating physician during this time period was Dr. Smith, who stated in 1995, that Gray's heart condition had improved and was under excellent control. Dr. Smith indicated in July 1998 that Gray's heart impairments have not been significantly troublesome to him  and that he should not have significant disability engaging in regular work-activities. He would not comment on the disabling effects of his back injury and suggested an independent medical exam.

The ALJ did consider the medical opinions of J. Scott Pritchard, D.O., Robert McDonald,

D.O., and Bill Hennings, Ph.D., all of whom reviewed the relevant medical records and determined that Gray was not disabled between December 1, 1989, and December 31, 1994. An independent medical examination of Gray at the time of the hearing, which occurred in March 2005, would not have been relevant to Gray's condition during the relevant period.

The only physician that considered Gray to be disabled was Dr. Hofmann, who began treating Plaintiff almost ten years after Gray was entitled to Benefits. Dr. Hofmann's letter of October 14, 2004, which indicated that Gray's "current activity level prevents him from being employable at this time," did not in any way relate to Gray's condition as of December 1994.

<u>CONCLUSION</u>

The Commissioner's findings on Gray's disabilities, considering the record as a whole, are supported by substantial evidence. The decision of the Commissioner should be affirmed.

<u>Scheduling Order</u>

The above Findings and Recommendation will be referred to a United States District Judge for review. Objections, if any, are due **December 29, 2006**. If no objections are filed, review of the Findings and Recommendation will go under advisement on that date. If objections are filed, a response to the objections is due fourteen days after the date the objections are filed and the review of the Findings and Recommendation will go under advisement on that date.

DATED this 8th day of December, 2006.


        /s/  Donald C. Ashmanskas
        DONALD C. ASHMANSKAS
        United States Magistrate Judge